# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF TENNESSEE
### NASHVILLE DIVISION

PILAR A. GILBERT,        )
                                             )
        Plaintiff,           )
                                             )
v.                                  )     No. 3:11-cv-0133
                                             )     Chief Judge Haynes
HIGHLAND RIM ECONOMIC     )
CORPORATION, *et al.*,         )
                                             )
        Defendants.       )

## M E M O R A N D U M

Plaintiff, Pilar A. Gilbert, filed this action under Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. 2000e et seq., and the Tennessee Human Rights Act, Tenn. Code Ann. § 4-21-101, et seq., against the Defendants, Highland Rim Economic Corporation and Highland Rim Head Start, her former employers. Plaintiff alleges discrimination based upon her race, national origin, color and retaliation in employment. (Docket Entry No. 1).

Before the Court is Defendants' motion for summary judgment (Docket Entry No. 35), contending, in sum, that: (1) Plaintiff's state law claims of discrimination and retaliation related to her 2009 near-termination a barred as untimely under state law; (2) Plaintiff's THRA and Title VII claims for discrimination and retaliation concerning her 2009 near-termination fail for lack of proof that the Defendants' decision maker was unaware of Plaintiff's complaint to the regional officer, that occurred before Plaintiff's EEOC charge; (3) that Plaintiff did not suffer any adverse employment action, and Defendants had a clear legitimate non-discriminatory reasons for Plaintiff's termination; (4) that Plaintiff's harassment claim fails because Plaintiff lacks evidence that the treatment was discriminatory; and (5) that Defendants have articulated a legitimate non-discriminatory reason for

the treatment for which Plaintiff cannot establish pretext or "severe or pervasive" discrimination.

## A. Findings of Fact[1]

Defendant, Highland Rim Economic Corporation ("Highland Rim"), is a non-profit corporation that operates Head Start programs in Houston, Stewart, Dickson, and Humphreys Counties in Tennessee. (Docket Entry No. 35-1, Redman Affidavit at ¶ 3). On November 6, 2007, Defendant hired Plaintiff, Pilar Gilbert, as family services worker for its Head Start program. (Docket Entry No. 43, Plaintiff's Response to Defendant's Undisputed Facts at ¶ 2). Plaintiff received her Bachelor's Degree in social work in 2007 and is licensed as a social worker in Tennessee. (Docket Entry No. 35-3, Plaintiff Deposition at 11). Plaintiff was working on her Master's degree in management during her employment with Highland Rim. Id. Plaintiff received extensive job training during her employment. (Docket Entry No. 35-1, Redman Affidavit at ¶ 12; Docket Entry No. 35-2, Plaintiff's Training Log).

On January 1, 2008, Plaintiff received a promotion to Family Services Manager. (Docket Entry No. 47, Defendant's Response to Plaintiff's Undisputed Facts at ¶ 3). At the time of Plaintiff's hiring and through October 2009, Sharon Davis was the Head Start Director. (Docket Entry No. 35-9, Davis Affidavit at ¶ 4). Davis was also Plaintiff's social acquaintance, friend, and immediate supervisor who worked regularly with Plaintiff. Id. at ¶ 3. In her affidavit, Davis stated that "[d]espite my personal feelings of friendship towards [Plaintiff], it became obvious to me that Ms.

---

[1]Upon a motion for summary judgment, the factual contentions are viewed in the light most favorable to the party opposing the motion for summary judgment. Duchon v. Cajon Co., 791 F.2d 43, 46 (6th Cir. 1986) app. 840 F.2d 16 (6th Cir. 1988) (unpublished opinion). As will be discussed infra, upon the filing of a motion for summary judgment, the opposing party must come forth with sufficient evidence to withstand a motion for directed verdict, Anderson v. Liberty Lobby, 477 U.S. 242, 247-52 (1986), particularly where there has been an opportunity for discovery. Celotex Corp. v. Catrett, 477 U.S. 317 (1986). The Court concludes that there are some factual disputes, but those disputes are not material given the material facts conceded by the Plaintiff. Thus, this section constitutes findings of fact under Fed. R. Civ. P. 56(d).

Gilbert didn't know how to do her job. I tried to help her learn the skills and tasks required of a Family Service Manager, but even after she had worked at Highland Rim for a couple of years, it seemed like she never grasped the basic concepts of the job." Id. at ¶ 5.

Carolyn Averitt was the Family Services Manager prior to Plaintiff taking that position. (Docket Entry No. 35-5, Averitt Affidavit at ¶ 2). Upon Plaintiff's promotion to Family Services Manager, Plaintiff would seek Averitt for assistance. Id. at ¶ 4. Accordingly to Averitt, she "accompanied [Plaintiff] to meetings with the United Way in which [Highland Rim] sought funding. [Averitt] felt like [Plaintiff] would freeze when asked to speak to the group, and would force me or one of her Family Services Workers to do the talking." Id. Jilly Ortago, Highland Rim's Operation Manager, stated that on several occasions she trained some of Plaintiff's family service workers because the workers were confused after training by Plaintiff. (Docket Entry No. 35-8, Ortago Affidavit at ¶ 5).

Many employees at Highland Rim related their beliefs that Plaintiff was unable to fulfill the duties of her position and that they were often unable to understand Plaintiff's instructions. (Docket Entry Nos. 35-4, 35-5, 35-6, 35-7, 35-8, 35-10, Affidavits of Highland Rim Employees). These employees also remarked that they could understand Plaintiff despite her accent unless she spoke very rapidly or was very excited. Id.

On or about February 2009, Plaintiff lodged complaints with the Head Start Regional Office in Atlanta, Georgia. (Docket Entry No. 35-3, Gilbert Deposition at 40, 52). Plaintiff received performance write-ups on February 25, May 20, and June 17, 2009. (Docket Entry No. 43 at ¶ 11). Sharon Davis, who witnessed these performance criticisms, wrote on February 25, 2009 that Plaintiff had to speak up for herself and her staff. (Docket Entry No. 35-11). On May 20, 2009, Sharon Davis

cited Plaintiff for Plaintiff's failures to check the accuracy of the mileage sheets, to ensure accuracy of those sheets, to improve her newsletter writing, to complete projects timely, and to meet the needs of the Family Service Workers, as well as to be an effective leader. (Docket Entry No. 35-12). In a letter, on June 17, 2009, Davis wrote Plaintiff, expressing her concerns about Plaintiff's inability during the staff meeting to articulate events of the family service workers and to answer questions about curriculum. (Docket Entry No. 35-13).

On August 6, 2009 Davis alone decided to recommend terminating Plaintiff. (Docket Entry No. 35-9, Davis Affidavit at ¶¶ 6, 8). Davis initiated the Plaintiff's termination before she learned of Plaintiff's complaints to the Head Start Regional Office. (Docket Entry No. 35-9, Davis Affidavit at ¶ 7). After Davis initiated Plaintiff's termination, Plaintiff wrote Bobby Griffin, from the Regional Head Start Office in Atlanta, explaining events after Davis informed Plaintiff of her intention to recommend Plaintiff's termination. (Docket Entry No. 43, Plaintiff's Response to Defendant's Undisputed Facts at ¶ 10). Highland Rim's personnel committee approved Davis' recommendation to terminate Plaintiff. (Docket Entry No. 35-15, Letter to Plaintiff).

On August 14, 2009, upon learning of the personnel committee's approval, Plaintiff filed an appeal grievance to Highland's Policy Council. (Docket Entry No. 43, Plaintiff's Response to Defendant's Undisputed Facts at ¶ 11). The Head Start Policy Council or the Personnel committee of that body decides termination issues for Highland Rim's employees. (Docket Entry No. 35-1, Redman Affidavit at ¶ 4). Highland Rim's Policy Council is composed of community members, parents, and other interested individuals. Id. The Head Start Director does not have firing authority, but the Head Start Director recommends firing an employee. Id. Highland Rim's Policy Council also reviewed the termination decision and reversed the termination. (Docket Entry No. 35-16, Policy

Council Meeting Minutes). The Policy Council elected to monitor Plaintiff's work performance. Id. The Policy Council also concluded that Plaintiff had not been afforded a sufficient corrective process, that Plaintiff's performance failures had not been sufficiently documented, and that Plaintiff's counsel had not received the relevant documents. Id. Plaintiff was taken off administrative leave and awarded back pay. Id.

Plaintiff returned to her job as Family Services Manager the first week of September. (Docket Entry No. 35-3, Plaintiff Deposition at 104). On September 4, 2009, Plaintiff filed an EEOC charge against Defendant, alleging discrimination based on race, national origin, and retaliation. (Docket Entry No. 35-14, EEOC Charge). Later, Plaintiff amended her EEOC charge to include discrimination based on color. (Docket Entry No. 35-20, Amended EEOC Charge). Plaintiff received her right to sue letter on November 23, 2010. (Docket Entry No. 43 at ¶ 48).

On October 1, 2009, Davis evaluated all managers' performance and Plaintiff received a score of 26.5 out of 50, less than satisfactory. (Docket Entry No. 35-18). Davis instituted an improvement plan with Plaintiff that same day. Id. Later that month, Davis left her employment at Highland Rim for reasons unrelated to this action. (Docket Entry No. 35-9, Davis Affidavit at ¶ 2).

In November 2009, Highland Rim hired a consultant, Eric Dupree, to serve as part-time interim Head Start Director. (Docket Entry No. 35-21, Dupree Affidavit at ¶ 2). Plaintiff only worked with Dupree for 41 days. Id. In his deposition, Dupree testified as interim director he recognized problems with Plaintiff's job performance, but was uncomfortable taking negative action against Plaintiff. Id. at ¶ 7.

Under Head Start's licensure requirements, Dupree was required to evaluate the job performance of the managers whom he supervised. Id. at ¶ 8. Under Highland Rim's evaluation

procedures, employees performed a self-evaluation and thereafter the supervisor evaluated the employee. (Docket Entry No. 35-1, Redman Affidavit at ¶ 25). Plaintiff submitted her self-evaluation with a summary score of 41.5, but Dupree was uncomfortable evaluating Plaintiff given his limited interaction with Plaintiff. (Docket Entry No. 35-21, Dupree Affidavit at ¶¶ 9-10). Yet, the 41.5 score is reflected on Dupree's evaluation of Plaintiff. (Docket Entry Nos. 35-22 and 35-23).

On August 26, 2010, Highland Rim hired Donna Redman as the new Head Start Director. (Docket Entry No. 35-1, Redman Affidavit at ¶ 2). Dupree did not discuss Plaintiff's prior work history with Redman. Id. at ¶ 8. Plaintiff, however, requested to discuss her prior conflicts, but Redman responded that she was not interested in past conflicts and would evaluate all employees on their future performance. Id. at ¶ 9. After her first week at Highland Rim, Redman " had serious concerns about [Plaintiff's] ability to do her job," but elected to give Plaintiff a chance to succeed in her management position. Id. at ¶ 10. Redman provided Plaintiff with formal and informal training in groups and one-on-one as well as individual counseling. Id. at ¶ 16.

On September 24 and September 27, 2010, Redman disciplined Plaintiff for performance issues. (Docket Entry Nos. 35-24 and 35-25). On or around September 24, 2010, Redman instructed Plaintiff to go home and think about whether the Family Service Manager position was right for her. (Docket Entry No. 43, Plaintiff's Response to Defendant's Undisputed Facts at ¶ 23). Redman also informed Plaintiff that she was considering a recommendation for Plaintiff's termination. Id. On September 28, 2010, Redman recommended that the Personnel Committee and Policy Council terminate Plaintiff. (Docket Entry No. 35-1, Redman Affidavit at ¶ 21). Plaintiff became very emotional at the Personnel Committee meeting and Redman withdrew her recommendation for termination and gave Plaintiff a performance improvement plan as well as additional training. Id.

6

at ¶ 22. Redman was unaware of Plaintiff's EEOC charge. Id. at ¶ 23.

Redman provided Plaintiff with additional training, but Redman eventually concluded that Plaintiff would continue to have performance issues. Id. at ¶ 16-17. Redman perceived Plaintiff as unable to present and lead meetings with parents, unfamiliar with the ChildPlus program, unable to understand reports and their content as well as failing to supervise family service workers and provide them necessary information for deadlines. Id. at ¶ 28. On October 4, November 2, and December 5, 2010, Redman again disciplined Plaintiff. (Docket Entry Nos. 35-26, 35-27, 35-28, 35-29). On December 16, 2010, Redman rated Plaintiff with a score of 22.5 out of 50 in her evaluation of Plaintiff's job performance. (Docket Entry No. 35-1, Redman Affidavit at ¶ 26; Docket Entry No. 35-30, Dec. 2010 Evaluation). Redman told Plaintiff that if her performance did not improve, ~~Redman would recommend Plaintiff's termination. (Docket Entry No. 35-1, Redman Affidavit at~~ ¶ 26).

On January 4, 2011, with Plaintiff's job performance not improving, Redman recommended Plaintiff's termination. Id. at ¶ 29. Redman states that her decision to recommend termination was based only upon Plaintiff's poor job performance. Id. at ¶ 33. The minutes of a meeting with the Policy Council reflect Redman explained her decision recommend Plaintiff's termination:

> Donna: [Plaintiff's] annual performance was completed in December 16th, 2010. When I did [Plaintiff's] evaluation and compared her self evaluation scores with mine, I found the score quite different. I reminded [Plaintiff] that we had had this conversation before, regarding sub standard job performance. I explained to her the ongoing improvement plan was not being met. [Plaintiff] was also aware that if things did not change that the Policy Council would be advised. I also explained to her that we needed a management team to work together. ON two separate occasions [Plaintiff] was behind on her own work which affected other Managers obtain Licensing/CACFP deadlines. There have also been problems and issues with Family Service Workers that needed to be addressed that were never taken care of. I feel that [Plaintiff] is not a take charge manager. She didn't have answer but instead she

always has to get back with me regarding issues that came up.

* * *

Donna: I have spent time with [Plaintiff] and have had the same conversations with her as I did with previous meetings and or counseling's. What I have counseled [Plaintiff] on would all be considered sub standard job performance issues. For example: I had pulled, on December 13th, 2010 a waitlist report. This report would show all children in our program that were on our waitlist by center. When a vacancy occurs, the first child on the waitlist for that site would be the next child to enroll. One child was on the report, since August, 2010 but not placed at any specific site. I asked Pilar why the child hadn't been placed and she said she would get back with me. On December 28, 2010, this child still did not have a site. What this means is that since August this child has not had the opportunity to enroll in any class. He has been passed by because he is not attached to a site. If [Plaintiff] had been monitoring, she would have picked this up and could have advised the Family Service Worker to assign a center to this child. As of this date, January 4th, the child still isn't assigned a site and I will take care of this immediately. There was no follow-through with [Plaintiff]. I find [Plaintiff's] performance was a manager is lacking. She does not seem to be able to make a decision or provide guidance for the Family Service Workers.

(Docket Entry No. 35-33 at 2-4). After the meeting concluded, the Personnel Committee and the Executive Committee of the Head Start Policy Council approved Plaintiff's termination. (Docket Entry No. 35-1, Redman Affidavit at ¶ 31).

Amy Dew, a family service worker at Highland Rim since 2007, was one of Plaintiff's subordinates during Plaintiff's employment as Family Service Manager. (Docket Entry No. 35-4, Dew Affidavit at ¶¶ 2-3). In her affidavit, Dew states that,

4.      While [Plaintiff] was my supervisor, other employees and I had to do a large portion of Ms. Gilbert's job.

5.      It appeared to me that Ms. Gilbert did not know how to do her job.

6.      I generally did not have trouble understanding Ms. Gilbert because of her accent, but I often did have to ask her to repeat herself because I did not understand her. When

that happened, I generally [] could not understand her because what she was saying didn't make sense to me, or it seemed to me that she didn't understand the subject she was talking about.

Id. at ¶¶ 4-6.

From 2009 until 2012, Highland Rim terminated seven employees. (Docket Entry No. 35-1, Redman Affidavit at ¶ 42). Each of the seven employees were terminated due to job performance issues. Id. Five of the terminated employees were Caucasian, one was a Pacific Islander, and one was African-American. Id. All of the terminated employees were native born United States citizens, except Plaintiff. Id. During her employment, Plaintiff was the only Filipino who had been hired by the Highland Rim Head Start. (Docket Entry No. 43, Plaintiff's Response to Defendant's Undisputed Facts at ¶ 28).

## B. Conclusions of Law

Motions for summary judgment are governed by Federal Rule of Civil Procedure 56. "The very mission of the summary judgment procedure is to pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial." Fed. R. Civ. P. 56 advisory committee notes. Moreover, "district courts are widely acknowledged to possess the power to enter summary judgment sua sponte, so long as the opposing party was on notice that she had to come forward with all of her evidence." Celotex Corp. v. Catrett, 477 U.S. 317, 326 (1986); accord Routman v. Automatic Data Processing, Inc., 873 F.2d 970, 971 (6th Cir. 1989).

In Anderson v. Liberty Lobby, Inc., 477 U.S. 242 (1986), the United States Supreme Court explained the nature of a motion for summary judgment:

Rule 56(c) of the Federal Rules of Civil Procedure provides that summary judgment

'shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.' By its very terms, this standard provides that the mere existence of <u>some</u> alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no **genuine** issue of **material** fact.

> **As to materiality, the substantive law will identify which facts are material. Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment.** Factual disputes that are irrelevant or unnecessary will not be counted.

<u>Id.</u> at 247-48 (emphasis in the original and added in part). Earlier the Supreme Court defined a material fact for Rule 56 purposes as "[w]here the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'" <u>Matsushita Electrical Indus. Co. v. Zenith Radio Corp.</u>, 475 U.S. 574, 587 (1986) (citations omitted).

A motion for summary judgment is to be considered after adequate time for discovery. <u>Celotex</u>, 477 U.S. at 326. Where there has been a reasonable opportunity for discovery, the party opposing the motion must make an affirmative showing of the need for additional discovery after the filing of a motion for summary judgment. <u>Emmons v. McLaughlin</u>, 874 F.2d 351, 355-57 (6th Cir. 1989); <u>see also</u> <u>Routman</u>, 873 F.2d at 971.

There is a certain framework in considering a summary judgment motion as to the required showing of the respective parties as described by the <u>Celotex</u> Court:

> Of course, a party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any," which it believes demonstrate the absence of a genuine issue of material fact. . . . [W]e find no express or implied requirement in Rule 56 that the moving party support its motion with affidavits or other similar materials negating the opponent's claim.

477 U.S. at 323 (emphasis deleted).

As the Sixth Circuit explained, "[t]he moving party bears the burden of satisfying Rule 56(c) standards." Martin v. Kelley, 803 F.2d 236, 239 n. 4 (6th Cir. 1986). The moving party's burden is to show "clearly and convincingly" the absence of any genuine issues of material fact. Sims v. Memphis Processors, Inc., 926 F.2d 524, 526 (6th Cir. 1991) (quoting Kochins v. Linden-Alimak, Inc., 799 F.2d 1128, 1133 (6th Cir. 1986)). "So long as the movant has met its initial burden of 'demonstrat[ing] the absence of a genuine issue of material fact,' the nonmoving party then 'must set forth specific facts showing that there is a genuine issue for trial.'" Emmons v. McLaughlin, 874 F.2d 351, 353 (6th Cir. 1989) (quoting Celotex, 477 U.S. at 322 and Rule 56(e)).

Once the moving party meets its initial burden, the Sixth Circuit warned that "[t]he respondent must adduce more than a scintilla of evidence to overcome the motion . . . . [and] must 'present affirmative evidence in order to defeat a properly supported motion for summary judgment.'" Street v. J.C. Bradford & Co., 886 F.2d 1472, 1479 (6th Cir. 1989)(quoting Liberty Lobby, 477 U.S. at 251, 255). Moreover, the Sixth Circuit explained that

> The respondent must 'do more than simply show that there is some metaphysical doubt as to the material facts.' Further, '[w]here the record taken as a whole could not lead a rational trier of fact to find' for the respondent, the motion should be granted. The trial court has at least some discretion to determine whether the respondent's claim is 'implausible.'

Street, 886 F.2d at 1480 (citations omitted); see also Hutt v. Gibson Fiber Glass Products, 914 F.2d 790 (6th Cir. 1990) (quoting Liberty Lobby, 477 U.S. at 151-52) ("A court deciding a motion for summary judgment must determine 'whether the evidence presents a sufficient disagreement to require a submission to the jury or whether it is so one-sided that one party must prevail as a matter of law.").

If both parties make their respective showings, the Court then determines if the material factual dispute is genuine, applying the governing law.

> More important for present purposes, **summary judgment will not lie if the dispute about a material fact is `genuine,' that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.**

> \* \* \*

> Progressing to the specific issue in this case, we are convinced that **the inquiry involved in a ruling on a motion for summary judgment or for a directed verdict necessarily implicates the substantive evidentiary standard of proof that would apply at the trial on the merits.** If the defendant in a run-of-the-mill civil case moves for summary judgment or for a directed verdict based on the lack of proof of a material fact, <u>the judge must ask himself not whether he thinks the evidence unmistakably favors one side or the other but whether a fair-minded jury could return a verdict for the plaintiff on the evidence presented.</u> The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff. ~~**The judge's inquiry, therefore, unavoidably asks whether reasonable jurors could find by**~~ **a preponderance of the evidence that the plaintiff is entitled to a verdict -- `whether there is [evidence] upon which a jury can properly proceed to find a verdict for the party producing it, upon whom the onus of proof is imposed.'**

<u>Liberty Lobby</u>, 477 U.S. at 248, 252 (citations omitted and emphasis added).

It is likewise true that

> [I]n ruling on motion for summary judgment, the court must construe the evidence in its most favorable light in favor of the party opposing the motion and against the movant. Further, the papers supporting the movant are closely scrutinized, whereas the opponent's are indulgently treated. It has been stated that: 'The purpose of the hearing on the motion for such a judgment is not to resolve factual issues. It is to determine whether there is any genuine issue of material fact in dispute. . . .'

<u>Bohn Aluminum & Brass Corp. v. Storm King Corp.</u>, 303 F.2d 425, 427 (6th Cir. 1962) (citation omitted). As the Sixth Circuit stated, "[a]ll facts and inferences to be drawn therefrom must be read in a light most favorable to the party opposing the motion." <u>Duchon v. Cajon Co.</u>, 791 F.2d. 43, 46 (6th Cir. 1986) (citation omitted).

The Sixth Circuit further explained the District Court's role in evaluating the proof on a summary judgment motion:

> A district court is not required to speculate on which portion of the record the nonmoving party relies, nor is it obligated to wade through and search the entire record for some specific facts that might support the nonmoving party's claim. Rule 56 contemplates a limited marshaling of evidence by the nonmoving party sufficient to establishing a genuine issue of material fact for trial. This marshaling of evidence, however, does not require the nonmoving party to "designate" facts by citing specific page numbers. Designate means simply "to point out the location of."

> Of course, the designated portions of the record must be presented with enough specificity that the district court can readily identify the facts upon which the nonmoving party relies; but that need for specificity must be balanced against a party's need to be fairly apprised of how much specificity the district court requires. This notice can be adequately accomplished through a local court rule or a pretrial order.

InterRoyal Corp. v. Sponseller, 889 F.2d 108, 111 (6th Cir. 1989) (citation omitted). In this district, the parties must provide specific references to the proof upon which they rely. See Local Rule 56.01(c) requiring each party to provide a statement of undisputed facts to which the opposing party must respond).

In Street v. J.C. Bradford & Co., 886 F.2d 1472 (6th Cir. 1989), the Sixth Circuit discussed the trilogy of leading Supreme Court decisions, and other authorities on summary judgment and synthesized ten rules in the "new era" on summary judgment motions

1. Complex cases are not necessarily inappropriate for summary judgment.

2. Cases involving state of mind issues are not necessarily inappropriate for summary judgment.

3. The movant must meet the initial burden of showing 'the absence of a genuine issue of material fact' as to an essential element of the non-movant's case.

4. This burden may be met by pointing out to the court that the respondent,

having had sufficient opportunity for discovery, has no evidence to support an essential element of his or her case.

5.      A court should apply a federal directed verdict standard in ruling on a motion for summary judgment. The inquiry on a summary judgment motion or a directed verdict motion is the same: `whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that the party must prevail as a matter of law.'

6.      As on federal directed verdict motions, the `scintilla rule' applies, i.e., the respondent must adduce more than a scintilla of evidence to overcome the motion.

7.      The substantive law governing the case will determine what issues of fact are material, and any heightened burden of proof required by the substantive law for an element of the respondent's case, such as proof by clear and convincing evidence, must be satisfied by the respondent.

8.      The respondent cannot rely on the hope that the trier of fact will disbelieve the movant's denial of a disputed fact, but must `present affirmative evidence in order to defeat a properly supported motion for summary judgment.'

9.      The trial court no longer has the duty to search the entire record to establish that it is bereft of a genuine issue of material fact.

10.      The trial court has more discretion than in the `old era' in evaluating the respondent's evidence. The respondent must `do more than simply show that there is some metaphysical doubt as to the material facts.' Further, `[w]here the record taken as a whole could not lead a rational trier of fact to find' for the respondent, the motion should be granted. The trial court has at least some discretion to determine whether the respondent's claim is `implausible.

Id. at 1479-80.

The Court has distilled from these collective holdings four issues that are to be addressed upon a motion for summary judgment: (1) whether the moving party "clearly and convincingly" established the absence of material facts; (2) if so, whether the plaintiff present sufficient facts to establish all the elements of the asserted claim or defense; (3) if factual support is presented by the nonmoving party, whether those facts are sufficiently plausible to support a jury verdict or judgment

under the applicable law; and (4) whether there are any genuine factual issues with respect to those material facts under the governing law?

### 1. Plaintiff's Discrimination Claims

Plaintiff's Title VII and THRA claims are that the Defendant discriminated against her based upon her race, color, and national origin[2] by terminating her from her position as Family Services Manager. "[A]n analysis of claims under the THRA is the same as under Title VII of the Federal Civil Rights Act." Lynch v. City of Jellico, 205 S.W.3d 384, 399 (Tenn. 2006). The Tennessee Supreme Court has stated, "[o]ur legislature intended for the THRA 'to be coextensive with federal law'... Although we are not bound or limited by federal law, '[t]he policy of interpreting the THRA coextensively with Title VII is predicated upon a desire to maintain continuity between state and federal law." Allen v. McPhee et al., 240 S.W.3d 803, 812 (Tenn. 2007) (quotations omitted). Thus, Plaintiff's Title VII and THRA claims are analyzed under the same legal framework.

For a prima facie showing of discrimination on the basis of race, color, and national origin, Plaintiff must prove that: "(1) she is a member of a protected class; (2) she was performing her job to her employer's legitimate expectations; (3) that in spite of her meeting the legitimate expectations of her employer, she suffered an adverse employment action; and (4) that she was treated less favorably than similarly situated employees." Hildebrant v. Illinois Dept. of Natural Res., 347 F.3d 1014, 1030 (7th Cir. 2003); see also Grosjean v. First Energy Corp., 349 F.3d 332, 335 (6th Cir. 2003).

Plaintiff's proof establishes that as a Pacific Islander, Plaintiff is a member of a protected class. As to Plaintiff's job performance, Plaintiff cites that she received training and only weeks

---

[2]Plaintiff is a Pacific Islander.

15

before her first termination, Davis told Plaintiff that she was doing a good job and not to worry. (Docket Entry No. 42 at 14). Plaintiff also cites Dupree's adoption of Plaintiff's self-evaluation score and Plaintiff's lack of notice of any poor job performance. Id. at 15. As to less favorable treatment of similarly situated employees, Plaintiff describes Redman's counseling and termination actions as discriminatory because Redman lacked prior knowledge of Plaintiff's work history, but "immediately focused in on Plaintiff, out of all other employees, and within weeks was counseling her and preparing a performance improvement plan." (Docket Entry No. 42 at 15-16).

Plaintiff proof, however, fails to identify any similarly situated employees who were treated more favorably than Plaintiff. Plaintiff simply refers to "out of all other employees" as to performance counseling. In this Circuit,

> "In order for two or more employees to be considered similarly situated for the purpose of creating an inference of disparate treatment in a Title VII case, the plaintiff must prove that **all of the relevant aspects of his employment situation are "nearly identical" to those of the [non-protected] employees who he alleges were treated more favorably.** The similarity between the compared employees must exist in all relevant aspects of their respective employment claims.

Tribble v. Memphis City Schools, 193 Fed. Appx. 401, 405 (6th Cir. 2006) (emphasis added). Thus, the Court concludes that absent proof of a similarly situated non-protected employee, Plaintiff fails to establish a prima facie showing of discrimination on the basis of race, color, and national origin.

Assuming Plaintiff could make a prima facie showing of discrimination on the basis of her race, color, and national origin, the burden shifts to the Defendant to offer a legitimate, nondiscriminatory reason for its decision to discipline the Plaintiff. Dews v. A.B. Dick Co., 231 F.3d 1016, 1021 (6th Cir. 2000). Defendant cites repeated counseling on Plaintiff's job performance and its documented history on Plaintiff's discipline. Defendant asserts that this discipline provides

legitimate reason, namely, Plaintiff's lack of performance as a manager. Thus, the Court concludes that Defendant satisfies its burden of proving a legitimate, nondiscriminatory reason for Plaintiff's discipline.

The burden then shifts to Plaintiff to prove that the Defendant's stated reasons for discipline are pretexts for discrimination on the basis of her race, color, and national origin. Dews, 231 F.3d at 1020 (6th Cir. 2000). Although the burden of production shifts to the defendant, "[t]he ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against [her] remains at all times with the plaintiff." St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502, 507 (1993); see also Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 147-48 (2000). Yet, in Griffin v. Finkbeiner, 689 F.3d 584 (6th Cir. 2012), the Sixth Circuit explained that for summary judgment, some evidence of pretext is sufficient to deny summary judgment.

> The question in Hicks was whether a showing of pretext 'mandates a finding for the plaintiff,' which is a different question from what a plaintiff has to show to survive summary judgment. The ultimate question of fact in a Title VII race-discrimination case is, of course, whether the defendant discriminated against the plaintiff on the basis of race. Racial animus is not the only inference that can be drawn from evidence that the proffered reason for a adverse employment action was pretext. Evidence that the employer's proffered reason for the termination was not the actual reason thus does not mandate a finding for the employee, but is enough to survive summary judgment. The jury can decide whether racial animus was the actual reason for Daughtrey's termination.

Id. at 594.

Here, Plaintiff lacks proof that Defendants' stated reason for Plaintiff's termination is pretextual. Plaintiff does not cite any facts of discriminatory treatment of her. Thus, the Court concludes that Plaintiff's proof cannot support a judgment on her Title VII or the THRA claim.

## 2. Retaliation Claim

For her retaliation claim, Plaintiff must make a prima facie showing with evidence (1) that plaintiff engaged in activity protected by Title VII, (2) that Plaintiff's exercise of those rights was known to Defendants, (3) that the Defendants then took adverse employment action against the Plaintiff or subjected Plaintiff to "severe or pervasive retaliatory harassment by a superior," and (4) a causal connection exists between the activity and the adverse employment action. Morris v. Oldham Cty. Fiscal Ct., 201 F.3d 784, 792 (6th Cir. 2000).

As to Plaintiff's protected activity, Plaintiff identifies the filing of her EEOC charge. As to whether Plaintiff's exercise of those rights was known to Defendants, Plaintiff testifies that the Highland Rim management were aware of Plaintiff's filing of the EEOC charge. As to adverse employment action, Plaintiff cites her termination. Construing the evidence in the light most favorable to Plaintiff, as required for this motion, the Court concludes that Plaintiff's proof makes a prima facie showing of retaliation.

With that conclusion, "the burden of production of evidence shifts to the employer to 'articulate some legitimate, nondiscriminatory reason' for its action." Canitia v. Yellow Freight Sys. Inc., 903 F.2d 1064, 1066 (6th Cir. 1990) (citing McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802 (1973). The Defendant's proof is that Plaintiff failed to meet the job performance standards for her managerial position despite many performance counseling sessions and additional training. The Court concludes this proof satisfies Defendant's burden of a valid rationale for its decision to terminate Plaintiff. Hartsel v. Keys, 87 F.3d 795, 800 (6th Cir. 1996).

As set forth earlier, the burden returns to Plaintiff to "demonstrate by a preponderance of the evidence that the proffered reason was a mere pretext" for retaliation. Abbott v. Crown Motor Co., Inc., 348 F.3d 537, 542 (6th Cir. 2003). Plaintiff lacks any evidence to challenge Defendant's

rationale for her termination or to present evidence of pretext. As stated on pretext for Plaintiff's discrimination claims, the Court concludes that Plaintiff's proof cannot support a judgment on Plaintiff's retaliation claim.

### 3. Harassment Claim

For Plaintiff's hostile work environment claim based upon her race, color, and national origin, "Plaintiff must prove (1) 'background circumstances [to] support the suspicion that the defendant is that unusual employer who discriminates against the majority;'" (2) that she was subjected to unwanted racial harassment, (3) that the harassment was based upon race, and (4) "that the harassment 'had the effect of unreasonably interfering with [her] work performance by creating an intimidating, hostile, or offensive work environment . . . [.]'" Arendale v. City of Memphis, 519 F.3d 587, 604–05 (6th Cir.2008) (citations omitted). Plaintiff must also prove that the employer is liable for such harassment. Barrett v. Whirlpool Corp., 556 F.3d 502, 515 (6th Cir.2009).

As to the fourth element, a court must assess whether Plaintiff's proof evinces "severe or pervasive" harassment, considering the totality of the circumstances and the following factors: "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether the conduct unreasonably interferes with an employee's work performance." Kelly v. Senior Ctr., Inc., 169 Fed. Appx. 423, 428 (6th Cir.2006) (citing Hafford v. Seidner, 183 F.3d 506, 512 (6th Cir.1999)).

As to employer liability, the court must consider whether the harasser was a supervisor or employee. Barrett, 556 F.3d at 515. Employers are vicariously liable for harassment by supervisors, and the employee need not show that the employer had knowledge of the harassment. Hafford, 183 F.3d at 513 (quoting Pierce v. Commonwealth Life Ins. Co., 40 F.3d 796, 804 n. 11 (6th Cir.1994)).

For co-woker harassment, Plaintiff must prove that the employer "'knew or should have known of the charged [racial] harassment'failed to implement prompt and appropriate corrective action.'" Hafford, 183 F.3d at 513 (quoting Pierce, 40 F.3d at 804 n.11).

On this claim, Plaintiff cites "being subjected to laughter when she spoke, being asked to repeat herself and then laughed at again, and told that she should go back to her country and talk to her Filipino friends." (Docket Entry No. 42 at 12). Plaintiff also cites that "[m]anagement constantly complained that they did not understand Plaintiff's speech." Id. The Defendant provides numerous affidavits explaining that the employees at Highland Rim could understand Plaintiff's speech despite her Filipino accent, but were sometimes unable to comprehend the meaning of what Plaintiff was saying because she often did not make any sense or seem to understand what she was talking about.

Although "accent and national origin are inextricably intertwined," In re Rodriguez, 487 F.3d 1001, (6th Cir. 2007), the Sixth Circuit has held that an employer's alleged failure to prevent derogatory comment of other employees about a worker's accent and ethnicity alone is insufficient to establish a hostile work environment. Rodriguez v. FexEx Frieght East, Inc. (In re Rodriguez), 487 F.3d 1001, 1010 (6th Cir. 2007). As to, Plaintiff's reliance on her own testimony and perception to establish harassment based upon her race. Such conclusory assertions cannot withstand a motion for summary judgment. Arendale, 519 F.3d at 605 (rejecting hostile environment claim when "Plaintiff's allegations of racially motivated harassment rest entirely on several statements which are either conclusory or raise no inference of racial animus" and were based on plaintiff's testimony stating personal opinion he was the victim of racial harassment.).

Applying Arendale to the proof, the Court concludes that Plaintiff's proof is insufficient to support a judgment for the harassment claim.

Accordingly, the Court concludes that the Defendants' motion for summary judgment (Docket Entry No. 35) should be granted.

An appropriate Order is filed herewith.

**ENTERED** this the 27th day of June, 2013.

WILLIAM J. HAYNES, JR.
Chief Judge
United States District Court